FRED G. JACKSON, RESPONDENT, v. FARMERS UNION LIVESTOCK COMMISSION, A CORPORATION, ET AL., APPELLANT.—181 S. W. (2d) 211.

Kansas City Court of Appeals. June 5, 1944.

450

*Strop & Strop* and *Livengood & Weightman* for appellants.

452

*J. B. Beevers, E. L. Redman* and *C. B. DuBois* for respondent.

BLAND, P. J.—This is a suit in two counts. The first count is upon an express warranty in the sale of sheep. The second count is in equity, wherein cancellation is prayed of a note and chattel mortgage, given by the plaintiff to the defendant, Farmers Union Credit Association, for the purchase price of the sheep. There was a verdict and judgment in favor of the plaintiff on the first count, and a decree in his favor on the second count.

The facts show that plaintiff was a man forty-two years of age, with a good education; that he owned a farm consisting of 776 acres, located in Nodaway County, where he lives; that his farm was well equipped for raising sheep; that he had had experience in raising sheep, but he was "not a sheep man", and that he had had no experience in handling diseased or sheep suffering from lung worms.

On August 15, 1941, plaintiff wrote Frank Daley, a sheep salesman for the defendant, Farmers Livestock Commission, of St. Joseph, expressing a desire to purchase some Western Ewes. On August 20,

1941, Daley answered plaintiff's letter, advising him that it was doubtful whether Western ewes could be purchased, but that he would make an effort to locate some of that character; that in regard to financing plaintiff in the purchase of the ewes it would be necessary for plaintiff to take the matter up with Paul Steele, the manager of the writer's company.

According to plaintiff's evidence he went to St. Joseph about the first of September, 1941, and saw Steele, the manager of the two defendants. The evidence shows that the defendants used the same office; that their directors and officers were largely the same, and that Steele was the manager of both. Steele took a financial statement from plaintiff, and it was agreed between them that plaintiff should purchase 600 ewes, and that the defendant, the Farmers Union Credit Association, would loan him the money for that purpose. Steele told him that he would sell him "healthy, sound, solid-mouthed, open Western breeding ewes, not bred and free from disease". The evidence shows that the word "open" means not bred. The sheep were to cost around $6 per head and were to be delivered at plaintiff's farm in Nodaway County.

On September 13th or 14th, in response to a telephone call from Steele, informing plaintiff that his ewes had come, plaintiff went to St. Joseph and there saw Steele in the offices of the two defendants. Steele told him that the sheep were there and plaintiff asked him if they were the kind that he had sold him and Steele answered in the affirmative. Steele introduced plaintiff to Frank Hudson "our sheep man" and told plaintiff that Hudson would show him the sheep. Hudson, in addition to being "our sheep man", was also the field man for the defendant, the Farmers Union Livestock Commission, and inspector of loans for the defendant, the Farmers Union Credit Association. Hudson took plaintiff to the Morris Yards in Kansas City, Kansas, and then to Linneus, in this State. They found the sheep in railroad box cars at the latter place. Plaintiff and Hudson were accompanied by defendants' witnesses, Cliffman and Edmunsen. According to plaintiff's evidence, he and Hudson each mouthed one of the sheep before they were unloaded. The one that plaintiff mouthed did not have good teeth. Plaintiff testified that the sheep looked bad; that they were small ewes and looked weak; that he was disappointed; that he told Hudson that he did not want the sheep and Hudson said that the sheep were all right; that they were good Western ewes and had good mouths and that plaintiff just happened to get hold of one that had gotten by when they were sorted; that the sheep "are just what Paul Steele told you they would be and I tell you they will be".

Plaintiff testified that he agreed to allow the sheep to be delivered to his farm with the understanding that they would not be his until they had been mouthed and bagged at his farm; that Hudson said that

he would be at the farm the next morning with the sheep and "we will go through them, mouth and bag them and paint them then, and will go through them until you are satisfied; they are not your sheep until you are satisfied; that Hudson said that the ewes had been taken off of short grass; that they had been on the road four or five days or a week; that when they got their fill of grass and rested up "you won't know the ewes".

The next day, September 14th, the ewes were delivered to plaintiff's farm in trucks, the truckers being accompanied by Hudson and Edmunsen. Defendant sold plaintiff eight bucks, which were located on Edmunsen's farm near Linneus, and the ewes numbering 397 and the eight bucks were delivered together. According to plaintiff's evidence, after the sheep arrived he went to his house to obtain paint for marking them; that during his absence the unloading of the sheep had commenced without anyone mouthing, bagging, counting or sorting them; that on his return to the scene of the unloading, he objected to this procedure and Hudson told him that the truckers were in a hurry to get back home and "we can unload the sheep, they will graze around and rest up and I will be back tomorrow to count them and we will go through them after they fill up, they will get strong and we will run them in and go through all of them". Plaintiff testified: "He told me as he did at Linneus, he told me they was good, healthy, sound sheep, all they needed was water and grass and ten days wouldn't know the sheep, I will be back here after these sheep get something to eat and I will do as I agreed to do, mouth them and bag them and you can paint them then for they are just what Paul Steele said they are, they got to be. . . . We will go through them, mouth and bag them and paint them then, and will go through them until you are satisfied; they are not your sheep until you are satisfied." Hudson did not return.

Steele had plaintiff and the latter's wife sign and execute, in Nodaway County, their promissory note and chattel mortgage covering the purchase price of the 397 ewes and eight bucks. These instruments were made in favor of the defendant, the Farmers Union Credit Association. The chattel mortgage described the sheep as solid-mouthed ewes.

About September 22, 1941, Steele called the plaintiff on the telephone and told him that the rest of the sheep were on hand to complete the 600 that plaintiff was buying. According to plaintiff's evidence he asked Steele what kind of sheep they were and Steele replied "just like the others, little better quality." Steele told plaintiff to come to St. Joseph and to the former's office. Plaintiff did as directed. The sheep were at the Morris Yards and plaintiff and Hudson went there to look at them. Plaintiff testified that Hudson told him that they had come from the same place as the others; that Hudson told him "as he did about the others; that they were good fine Western

ewes, open and good ewes to raise lamb''; that the witness said that they looked a little better than the others, but that some of them looked weak; that Hudson agreed to deliver the sheep to plaintiff's farm ''and the same kind of deal as the others was'' . . . He was to deliver them at my farm at their risk and not to be my sheep until I was satisfied''; that the sheep were shipped to Ravenwood and Hudson notified plaintiff that they were there and asked him to come to Ravenwood; that when they opened the car door there was a dead sheep in front of the door; that 166 sheep from this shipment were delivered to plaintiff's farm. Plaintiff testified that Hudson told him that when the sheep arrived at plaintiff's farm ''I will come up the next morning and we will count this bunch and the ones you received before, the whole bunch, we will mouth them and bag them and you can get paint and paint them then''; that Hudson never came to plaintiff's farm for this purpose.

On September 24, 1941, plaintiff and his wife executed their note in the sum of $3626.80 and, to secure the same, executed a chattel mortgage on all of the sheep. Said note and chattel mortgage were in favor of the defendant, the Farmers Union Credit Association. This sum included $100 for the purchase of additional bucks for breeding the ewes. It appears that these bucks were never purchased. The note and chattel mortgage first given by plaintiff and his wife were returned to plaintiff. The new mortgage described the ewes as ''solid-mouthed ewes''. The note for $3626.80 and the chattel mortgage securing the same, are in the possession of, and are owned, by said defendant. The note is now past due. Plaintiff purchased the sheep relying upon the warranties.

According to plaintiff's evidence the ewes that were delivered to him were not sound and healthy and did not have solid mouths, were not Western ewes, were not free from disease, but were, in fact, unsound, unhealthy, old Southern ewes, diseased, bred, had broken mouths and, in the spring of 1942 many of them were found to be suffering from lung worms; that within about a week after plaintiff received the ewes they began to lamb and die.

Plaintiff testified that he wrote Hudson about coming to count the sheep and informed him that the ewes were having lambs and were dying; that Hudson came to plaintiff's farm about two weeks after the last ewes were delivered; that ''I got on him about the ewes having lambs, he says maybe they will have a few lambs and they will quit, and he says I told you before these ewes, a few may die along and take some time to straighten them up and they will quit, you work along with them and they will really go to doing what they ought to do.''

Plaintiff told Hudson to inform Steele that the ewes were lambing and dying and plaintiff called Steele on the telephone and told him that the ewes were dying. Steele and one of defendants' directors, Allyn, came to plaintiff's farm in November and told him that the ewes

would quit lambing and dying ''just like Hudson did''. . . . ''And they would get these off my hands, fellows over the country wanting them ewes like hot cakes. Q. How long did they stay at your place? A. They were there, we looked over the thing anywhere from one and a half to two hours. I think longer. Q. What did they finally say to you about the sheep before they left there? A. Well they left it with me, they was going to help me, assured me they would quit lambing and quit dying and would help me get rid of the ones going to lamb.'' Plaintiff testified: ''Two-thirds of the lambs and ewes were dying, then when Paul Steele was there and dead sheep there''.

According to plaintiff's evidence the ewes continued to bring lambs throughout the fall, winter and the early spring. From 563 ewes plaintiff should have raised and saved at least, 180 lambs. By reason of the lambs being born out of season and the diseased and unsound condition of the ewes, plaintiff was able to save only eighty-one lambs of poor quality, 257 ewes died, and the remaining 306 were weak, rundown and diseased. What were left of the lambs and sheep were sold by plaintiff in the fall of 1942 on the Kansas City Livestock market. Plaintiff received $1377.07 for them. From the wool sheared and sold from the sheep plaintiff received $690.86, making a total of $2067.93, received by plaintiff covering the two items.

Defendants' evidence tends to show that the sheep belonged to Edmunsen; that plaintiff was so advised, and that the Farmers Livestock Commission, sold the sheep to plaintiff, acting purely as a broker or factor for Edmunsen; that neither of the defendants, nor any of their agents, warranted the sheep in any particular; that Edmunsen notified plaintiff when he bought the sheep that they were *Texas* ewes and that all of them did not have solid mouths. Defendants' evidence also tends to show that the ewes were a good, healthy, average or fair bunch of sheep. Defendants introduced letters received from plaintiff stating, in effect, that the owes were doing well. In this connection, plaintiff wrote the Farmers Union Credit Association about September 15, 1941, that he had checked the sheep closely; that eleven had bad bags and ''three with bugs'' and ''You call me as soon as you can show me another bunch and I will be right in your office''.

On September 26, 1941, plaintiff wrote Steele: ''The ewes are doing fine filling in good shape.'' About December 24, 1941, Steele wrote plaintiff that the Board of Directors of the Farmers Union Credit Association would convene immediately after the first of the year to examine outstanding loans, and asked plaintiff to fill in answers to a questionnaire enclosed. In answer to the question: ''Are they (the ewes) in good condition?'' Plaintiff answered: ''Done well''. In answer to other questions, he stated that he had 558 ewes on hand and that they would be lambing in March.

On January 5, 1942, plaintiff wrote Steele concerning the extremely bad winter, and stating that he did not have the time to take care of

the ewes "along with all of the hogs and cattle I have". According to defendants' evidence this was the first time that plaintiff stated to defendants, or any of their agents, that he did not want the ewes, but he made no complaint about them at that time. One of plaintiff's employees testified that plaintiff told him that the ewes had pregnancy paralysis. On February 2, 1942, plaintiff wrote Steele that the ewes "are doing all right. I have 33 lambs they are doing fine. I want you to keep it in mind that want these ewes sold any time now". On March 9, 1942, plaintiff wrote Steele: "I have done fairly well with them, I guess, but lost a lot of them and they have had the best of feed. Send him (Hudson) around right away, have some lambs and they'll start right in a week or 10 days. I want to get them sold just so I can come out on them, sell them by the head lambs throwed in, I've got so many cattle, cows calving, sows pigging that I can't handle these ewes. Grass is about here, the lamb market is good, shearing time is here, looks like he ought to get these ewes sold for me. . . . I would not think of selling these ewes if I had the time for them, $4 worth of wool to the ewe and on $8—1000 lambs its all right but I can not and won't have the time—there better than live stock wintered, grass here and just ready to lamb".

In reference to the answers he gave in the questionnaire plaintiff stated that Hudson told him that Steele was going to have a Board meeting and that Steele "would like to have a satisfactory report made up"; that he made this report as an accommodation to Hudson and Steele.

Defendants' evidence tends to show that the defendant, the Farmers Union Livestock Commission, a corporation, had nothing to do with the sale of the sheep in question and that the Farmers Union Credit Association does not sell livestock on a commission, or otherwise; that the latter's business is confined to lending money to farmers, producers and feeders in the territory tributary to St. Joseph and the St. Joseph livestock market; that there is in existence a concern called the Farmers Union Livestock Commission, which is a joint marketing agency for other Farmers Associations, located in neighboring states; that the corporation, known as the Farmers Union Livestock Commission, *Inc.*, is among those for whom the marketing agency sells livestock on the market in St. Joseph; that the *corporation* does not engage in the selling of livestock on a commission basis; that the corporation was also organized for the purpose of protecting the name of "Farmers Union", "the marketing agency". In other words, we take this to mean that one of the purposes of the corporation was to monopolize the name "Farmers Union Livestock Commission".

The evidence shows that all three of these concerns have the same office in St. Joseph and that most of their directors and officers are identical; that Steele was their manager.

Defendants' witness, Allyn, testified that he was a director of both the Farmers Union Credit Association and the Farmers Union Livestock Commission; that the Board of Directors of the Farmers Union Livestock Commission Company is made up of a number of farmers "from different states"; that the business of the Farmers Union Livestock Commission Company is the selling of livestock; that he was a director "in both of the Corporations, defendants in this case"; that the qualifications of a member of the Board of Directors of the Farmers Union Livestock Commission Company and the Farmers Union Credit Association are "He is to be appointed by State wide organization on this Board and that to be approved by the Board? Q. Does that mean he has to own stock or capital assets of the company? A. He owns stock in the Credit Association"; that the meeting of the Board of Directors of the Farmers Union Credit Association and the Farmers Union Livestock Commission was held at the same time. "Each separately. . . . I wouldn't say done the same day, but at the same time"; that the chairman of both corporations is the same; that both of these corporations had a meeting about the first of the year 1942; that at that meeting the "Fred Jackson sheep deal came up".

The letter-head used by the Farmers Union Credit Association states: "Affiliated With Farmers Union Live Stock Commission South St. Joseph, Missouri. When you ship live stock, consign it to your own Co-operative firm *The Farmers Union* we finance live stock feeder loans."

Plaintiff contends that under the evidence, these three concerns are the same, or so closely affiliated, as to be, for all practical purposes, the same concern. Defendants say, in their brief, that they are separate concerns and that the evidence shows that the Farmers Union Live Stock Commission, Incorporated, had nothing to do with the sale or the contract in controversy. However, neither of the defendants, in their brief, make the point that the instruction in the nature of a demurrer to the evidence offered by the defendant, the Farmers Union Live Stock Commission, a corporation, should have been given. Therefore, it may be assumed that the defendants conceded, at the trial, that there was sufficient evidence in the record tending to show that the defendant, Farmers Union Livestock Commission, a corporation, was a party to the warranty claimed by plaintiff.

Defendants insist that the circuit court had no jurisdiction over this cause of action. This matter was duly raised below. The action was brought in Nodaway County and went to Harrison County on change of venue. In this connection defendants say that the warranty, though a part of the contract of sale, was collateral thereto and, if false, it was broken at the time it was made. Defendants say that the evidence shows that the warranty, if any, was made in Linn County where Linneus is situated, and not in Nodaway County. In this connection defendants say they, being domestic corporations, with

offices in Buchanan County, could not be served with process in Nodaway county; that under the provisions of section 874, Revised Statutes Missouri, 1939, suits against such corporations must be commenced either in the county where the cause of action accrued or in any county where such corporation shall have or usually keep an office or agent for the transaction of their usual and customary business.

The proper disposition of defendants' point depends upon the question as to where the cause of action for the breach of the warranty accrued. In this connection defendants say that plaintiff, himself, testified that the entire agreement, in respect to purchasing the sheep, was had at Linneus. Defendants refer us to the record where plaintiff was questioned in reference to his deposition, and where he testified that he stated in his deposition that the terms of the contract "were all agreed on at Linneus". While plaintiff so testified, he did not state that what he said in his deposition was true. On the contrary, at the trial, he testified positively that the sheep were to be delivered, bagged and mouthed at his farm, and that they were not to become his sheep until he was satisfied. Plaintiff is not conclusively bound by what he said in his deposition. [Braden v. Floor & Wall Tile Co., 223 Mo. App. 700.] Plaintiff had the right to reject the sheep when they were bagged and mouthed on his farm. Under such circumstances, there is no question but that the contract was not made in Linn County. [13 C. J., pp. 289, 290, 293.] Of course, there was no warranty until the final contract was entered into. The warranty was, therefore, made in Nodaway County when plaintiff accepted the sheep without their being bagged and mouthed. The cause of action was properly brought in that county. [Mayo et al. v. Price Co., 218 S. W. 923, 933; Moherstadt v. Newman, 217 S. W. 591.]

Complaint is made of the giving of plaintiff's Instruction "A". It is stated that the instruction assumes the fact that plaintiff believed and relied upon the statements attributed to the defendants and also assumes that the ewes were not healthy, sound, solid-mouthed, open Western breeding ewes free from disease and well suited for breeding and feeding purposes. We find no merit in this contention. The instruction is quite long and it would serve no useful purpose to set it forth herein. It starts out by telling the jury: "*The court instructs the jury that if you believe and find from the evidence* that on the— day of September, 1941, the defendants agreed to sell to plaintiff and plaintiff agreed to buy from defendants approximately 600 healthy, sound, solid-mouthed, open Western breeding ewes free from disease . . . and stated to plaintiff that they were such, and that plaintiff believed and relied upon such statements and warranties, if any"; that plaintiff purchased the sheep "believing and relying upon said statements and warranties, if any, of defendants and believing them to be true" in executing the promissory note and chattel mortgage; that plaintiff exercised due care in the purchase of the sheep "and was

unable to discover the diseased condition of said sheep and did not know that said sheep were so diseased, if they were'', etc. [Italics ours.]

It is quite apparent that there is no assumption of any such facts made in the instruction. [Warneke v. Rope Co., 186 Mo. App. 30, 45; Costello v. Kansas City, 219 S. W. 386, 391.]

However, it is claimed that the instruction is erroneous in that it does not require the jury to find ''that either the defendant Farmers Union Livestock Commission, Inc., was agent for the Farmers Union Credit Association, a corporation, of that the Farmers Union Credit Association, a corporation, was agent for the Farmers Union Livestock Commission, Inc., or that either or both of said companies were the owners of the sheep.''

It is true, the instruction does not have the jury find that said companies were the owners of the sheep; but there is no evidence, or inference from the evidence, that either of these corporations was the agent of the other in this transaction.

Plaintiff's evidence tends to show that the warranty was made by both corporations as principals. Defendants' evidence tends to show that neither one was acting as the agent for the other in any transaction. In fact, defendants say, in their brief, that the defendant, Farmers Union Livestock Commission, Inc., was a third party, having nothing to do with the transaction. There is not present any question of disclosed or undisclosed principals so far as these two corporations are concerned.

It is insisted that the instructions given by the court on behalf of the plaintiff were erroneous, for the reason that they give undue prominence to the unpaid purchase price of the sheep by mentioning it nine times in the instructions. There were eight instructions given at the request of the plaintiff and, while the purchase price was mentioned nine times, that matter was not an issue in the case and, therefore, there was no undue prominence given to any *issue* by the instructions. The purchase price was admitted and there was no emphasis placed upon the purchase price, as such, in the instructions. In view of the theory upon which plaintiff submitted the case (a matter hereinafter discussed) it was necessary for his instructions to mention the amount of the note as often as was done. There is no merit in the contention.

Complaint is made of the refusal of the court to give defendants' Instruction No. 6, reading as follows: ''The court instructs the jury that if you find and believe from the evidence that at the time plaintiff purchased the sheep mentioned in evidence, defendants disclosed to plaintiff that they were not the owners of said sheep and that said sheep were owned by one Joe Edmunsen and plaintiff so understood, if you so find, then you are instructed that even though defendants may have warranted said sheep, nevertheless your finding and verdict will

be for the defendants unless you find and believe from the evidence that the parties intended that the defendants should be bound by said warranties, if any''.

We think that this instruction should have been given. Defendants' evidence tends to show that plaintiff was advised that defendants did not own the sheep but that they were owned by Edmunsen. If defendants disclosed their agency for Edmunsen, they are not liable upon the warranty, unless they intended to bind themselves, personally. Of course, they could have made the warranty with the intention of binding themselves, even though they disclosed their agency. In Hunt v. Sanders, 281 S. W. 422, defendant sold to the plaintiff certain promissory notes, which proved to be forgeries, upon a warranty that they were good and valid. Defendant conducted the negotiations for the sale of the notes as though he were the owner of them, on a warranty that they, and the deeds of trust securing them, were good and valid. He did not disclose to the plaintiff that he was not the owner, and that he was acting for one Wilgus. Defendant denied that any warranty was made. Plaintiff's instruction told the jury that, if they found that ''the defendant *expressly* warranted to plaintiff the validity of the notes and deeds of trust in question, or any of them, and the plaintiff relied on said warranty, if any, and the said notes and deeds of trust were forgeries, then the plaintiff is entitled to recover from the defendant the money paid by plaintiff for the notes and deeds of trust, or note and deed of trust, so warranted and relied on, if any, even though the defendant did not tell the plaintiff at the time of the sale that A. B. Wilgus, Jr., was the owner of such note and that he was merely acting as agent for said Wilgus''. (Italics ours.) The court ruled, l. c. 425: ''As already intimated, the vital question in the case is whether the defendant warranted the notes to be what they purported to be. If he sold the notes as owner, or as the agent of an undisclosed principal, the warranty by implication of law is his; if he disclosed his principal, and, notwithstanding, personally warranted the notes to be genuine, the warranty is his. The instruction required the jury to find that the 'defendant expressly warranted', etc., but at the same time it assumed that the defendant 'was merely acting as the agent for said Wilgus'. It should have gone further and required a finding that the defendant, in expressly warranting the validity of the notes, intended to bind himself personally''.

Defendants' Instruction No. 6, in the case at bar, sought to have the jury told that if defendants informed plaintiff that the sheep belonged to Edmunsen and the defendants, in making the warranty, did not intend to bind themselves, personally, and that plaintiff so understood, the finding should be for them. Under the holding in Hunt v. Sanders, *supra,* the court should have given this instruction. [See, also, Dale v. Comm. Co., 160 Mo. App. 314, 318; Schell v. Stephens, 50 Mo. 375; 3 C. J. S., pp. 119, 120, 121.]

It is true, in plaintiff's instruction, the jury was required to find that defendants *expressly* warranted the sheep and in defendants' Instruction No. 15, they were told that if they believed from the evidence that the defendants did not expressly warrant said sheep, their verdict should be for the defendants. The subject covered in these instructions is whether there was any express warranty made by defendants. They do not submit the issue sought to be submitted in defendants' offered Instruction No. 6.

It is well settled that each of the parties has a right to have his view of the law presented in a form acceptable to him; that a party has a right to an instruction placing before the jury, in plain and direct terms, every legal phase of the case which is justified by the evidence; that a party is entitled to an instruction based upon evidence which favors him, even though such evidence may conflict with evidence offered by the opposing party. [Lee Cahn v. A. J. Reid et al., 18 Mo. App. 115; National Warehouse & Storage Co. v. P. Toomey et al., 181 Mo. App. 64; Robb v. St. Louis Public Service Co., 178 S. W. (2d) 443.]

Complaint is made of the refusal of defendants' Instruction No. 7, and the giving of plaintiff's Instruction "B". Defendants' Instruction No. 7 reads as follows: "The court instructs the jury that whether or not the note executed by the plaintiff and his wife to the defendant Farmers Union Credit Association, Inc., is or is not paid is not an issue in this case and should not be considered by you". Plaintiff's Instruction "B" is on the measure of damages, and told the jury that, if they found for the plaintiff, in assessing his damages, they should take into consideration the difference in the value of the sheep as warranted and the actual value of the sheep, and for the loss to plaintiff of such profits as reasonably appeared would have been made by plaintiff had said sheep been as warranted, and for money necessarily and reasonably expended by plaintiff in doctoring and caring for the sheep and lambs in excess of what would have been required had the sheep been as warranted, and for feed furnished and fed to such sheep in excess of what would have been required had said sheep been as warranted, and for services performed in caring for said sheep in excess of what would have been required had said sheep been as warranted, "*and if you find that plaintiff has been damaged in an amount in excess of said sum of* $3,579.50, ($3,526.80, *the amount of plaintiff's indebtedness to the defendant, Farmers Union Credit Association) your verdict will be for plaintiff for such excess, if any. But if you find for plaintiff in a sum less than said sum of* $3,579.80 ($3,526.80) *you will state in your verdict the amount, if any, so found by you.*" (Italics ours.)

The sum of $3579.80 ($3526.80), mentioned in the instruction, refers to the amount of the indebtedness of plaintiff to defendant, the

Farmers Union Credit Association, on account of the note that he and his wife gave to it to cover the purchase price of the sheep.

The jury returned a verdict assessing "Plaintiff's damages in excess of said sum of $3,526.80 at the sum of $314.50".

Thereupon, the court tried Count II of plaintiff's petition and found that, the note having been paid, plaintiff was entitled to have his note and chattel mortgage cancelled, and entered judgment against the defendants on Count One of plaintiff's petition "in accordance with the verdict of the jury herein, damages in excess of the sum of $3526.80, to-wit: the sum of $314.50, found by the jurors aforesaid; and on Count II of Plaintiff's said petition, it is further considered, adjudged and decreed, that said promissory note and chattel mortgage . . . be and hereby are cancelled and for naught held, and that said defendants be, and they hereby are perpetually enjoined from the collection thereof and the judgment herein on the verdict of the jurors aforesaid being satisfied to such extent", and adjudged that the plaintiff recover from the defendants the sum of $314.50, in accordance with the verdict of the jury.

Thereafter defendants filed motions for a new trial and in arrest of judgment. The court required the plaintiff to remit $1000. Plaintiff remitted said sum and paid into court the sum of $685.50 for the use and benefit of the defendant, the Farmers Union Credit Association. The court, thereupon, entered judgment in favor of the plaintiff and against the defendants in the sum of $2841.30, cancelled the note and chattel mortgage, and adjudged that the $2841.30 plus the $685.50 equalled the amount of plaintiff's indebtedness to the defendants and off-set each other and that the judgment was satisfied in full.

Defendants insist that their Instruction No. 7 should have been given and that plaintiff's Instruction "B" relative to the off-set is erroneous, because it is the rule that a defendant holding a claim against the plaintiff is not compelled to avail himself of it but he has the option of pleading the same by way of off-set in an action against him or make it the ground of an independent action. This contention must be sustained as defendants did not ask for any off-set founded on the note.

"The common law does not recognize the principle of compensation and extinguishment of debts by the mere operation of law as established and maintained by the civil law, and unless otherwise provided by statute, mutual indebtedness does not work an extinguishment of the respective debts, without an application of them to each other by the concurrent acts of the parties. In the absence of statute providing otherwise, a defendant holding a claim against plaintiff is not compelled to avail himself of it but has the option of pleading the same by way of set-off in an action against him, or of making it the ground of an independent action, or of relying on it as a defense to another action by the same plaintiff. So, also, in the absence of statute pro-

viding otherwise, defendant is not obliged to set up matter available to him by way of recoupment or counterclaim, but may make it the ground of an independent action, as in the case of a set-off. Plaintiff in a suit, against whom a cross demand of the character under consideration exists, has no power or option in the premises, but must submit to whatever course defendant elects to pursue''. [57 C. J., p. 517.]

We have examined Day v. Dox, 24 Am. Dec. 137, and other authorities cited by plaintiff, and find them not in point. In the Day case the agreement to sell the wheat was wholly executory and the promise of defendant was dependent upon the performance of a condition precedent by the plaintiff. The covenant was dependent. In the case at bar no covenant of any kind is involved. The ewes were sold and delivered by the defendants and it is admitted that they were paid for by the note for $3526.80. The suit on the warranty is on a different contract than would be a suit on the note.

Failure of the defendant, Farmers Union Credit Association, to file a counterclaim for the amount of the indebtedness does not estop it from prosecuting an independent action on the note. [Rhodus v. Geatley, 147 S. W. (2d) 631.]

Other complaints are made in reference to Instruction ''B''. In this connection it is said that the instruction is erroneous in that it fails to limit the amount of specific damages alleged in plaintiff's petition. This has reference to the damages alleged in the petition in reference to feed. However, we find no evidence of the amount of such damages being in excess of the value of the feed mentioned in the petition. Under such circumstances, there was no error in the instruction in this respect. [Hyatt v. Wab. Ry. Co., 69 S. W. (2d) 627, 632.]

However, it is insisted that the instruction is erroneous in permitting the jury to award damages on items not shown by the evidence. In this connection defendants point out that plaintiff ''never offered one word of proof that of the feed fed to these sheep in question more feed was required than for healthy sheep''.

Plaintiff, in his petition, alleges that he fed the sheep $1690.70 worth of feed, and alleges that he was greatly damaged in the loss of this feed. ·There is a serious question as to whether this allegation is sufficient to raise any issue as to any loss of feed in excess of that that healthy sheep would have required. However that may be, there was no evidence from which the jury could arrive at any verdict upon this issue, and the instruction was clearly erroneous. [Grattan v. Seudmeyer, 144 Mo. App. 719, 726, 727; Huddleston v. Ozark Acceptance Corp., 125 S. W. (2d) 81, 84; Edmonston v. Kansas City, 57 S. W. (2d) 690.]

It is further claimed that the instruction is erroneous in that it did not require the jury to take into consideration the amount that plaintiff received from the sale of the sheep and the wool, which

amounts plaintiff retained and has not tendered or paid to the defendants, or either of them. In this connection defendants say that plaintiff may not rescind or have the contract cancelled and sue for damages, but if he sues to rescind or for the cancellation of the contract, he must return what he received. We are of the opinion that there is no question of rescission involved in this case. Plaintiff affirmed the contract by suing on the warranty and in his instructions he merely sought to give credit to the defendants for plaintiff's indebtedness to the Farmers Union Credit Association. The petition sought to have the note and the chattel mortgage cancelled, not on the theory of rescission, but on the theory that they were paid, the petition, having asked damages far in excess of the amount of the note. What plaintiff received for the sheep and the lambs merely goes to the question of the value of the sheep. As to the wool, plaintiff affirmed the contract by suing on the warranty and is entitled to the wool; but, of course, he is not entitled to the time, effort and expense attendant on the production of the wool. No request was made for payment of these items and none of them was submitted to the jury.

No doubt, plaintiff, at another trial, will reform the instruction to meet the objection of the defendants as to the measure of damages submitted relative to the value of the sheep as warranted and their actual value.

It is insisted that the court erred in permitting plaintiff to testify to certain statements made by Frank Hudson. These statements were as follows: "I got on to him about the ewes having lambs, he says maybe they will have a few lambs then will quit, and he says I told you before these ewes, a few may die along and take some time to straighten them up and they will quit, you work along with them and they will really go to doing what they ought to do".

Defendants contend that this statement was made long after the warranties, on which plaintiff predicated his suit, were made; that the statements were hearsay and not binding upon the defendants, for the reason that the transaction had long been terminated. We think defendants are in error about this. Plaintiff stated that this conversation was had with Hudson about two weeks after the ewes were delivered. The statement was made by Hudson at the time plaintiff was attempting to get him to bag and mouth the sheep. Under plaintiff's testimony, the contract was not to be completed until such time as this was done and he was satisfied. This was never done by Hudson. Of course, the contract was completed when plaintiff, notwithstanding the failure of Hudson to count, bag and mouth the sheep, accepted them by keeping them. Just when the acceptance of the sheep can be said to have taken place is not important except that there was no such acceptance at the time of the conversation.

Defendants contend that the court erred in failing to discharge the jury, because plaintiff's counsel, in his opening statement, referred to

the fact that in April, 1942, plaintiff, his attorney, Hudson and an attorney for the defendants, met at plaintiff's farm and made a tentative agreement that defendants would take back the sheep for $2500 with the reservation that plaintiff retain all right to sue defendants for damages and that defendants' rights be reserved to proceed against plaintiff on the note and chattel mortgage. The court sustained the objection to this statement on the ground that it involved a question of settlement. We think the court was correct in sustaining the objection. Whether the court abused its discretion in not discharging the jury, we need not say, for the reason that, at another trial, this incident should not be repeated.

In his argument to the jury counsel for plaintiff stated: "Jesse James was a gentleman compared to these fellows". Defendants' objection to this statement was sustained, but their motion to discharge the jury was overruled. The court properly sustained the objection. It is unnecessary to say whether the court should have discharged the jury as, at another trial, this incident should not be repeated.

Complaint is made of the giving of plaintiff's Instruction "E" on the question of the credibility of the witnesses. Plaintiff admits that this instruction is not properly worded in some respects, but says that the instruction, as worded, does not amount to reversible error. At another trial this instruction should be reformed so that its giving will not constitute error, reversible or otherwise.

It is insisted by plaintiff that "The decree and judgment of the court, cancelling the note and mortgage under the equitable action pleaded in Count II, and adjusting the equities of the parties by requiring plaintiff to pay money into court, unchallenged by the defendants either by demurrer or in motion for new trial, or by assignment of error, fully determines the right of the parties in the cause, and is a final judgment not subject to review. The court sitting in equity tried the issues of law and fact under Count II, and its decree with respect to said count being unchallenged became and is a final judgment and decree".

Undoubtedly, parts of defendants' motion in arrest of judgment is directed to the judgment founded on Count II, but however that may be, no assignment of error is made in defendants' brief relative to the matter. We have concluded that even had the judgment not been mentioned in the motion in arrest of judgment, and even though there is no assignment of error in defendants' brief directed to the matter, these circumstances do not authorize us to affirm that part of the judgment or decree founded on Count II.

"In remanding a cause and in determining the scope to be taken by the new trial, if the error in the previous trial relates only to a certain issue or feature of the case which is not at all dependent for its proper trial on other issues in the case already satisfactorily tried and disposed of, and a partial or limited retrial will work no injustice to any

of the parties to the cause, then the cause may properly be remanded for the retrial of the issue or feature theretofore erroneously tried, and for that purpose alone. However, if the whole of the issues are so interrelated and interdependent that the trial of the one issue or feature necessarily involves the trial of the other, then the whole case, if before the appellate court, should be remanded for a new trial so that the rights and liabilities of the respective parties may be tried out and adjudicated at one and the same time, by the same jury, and upon the same evidence, to the end that inconsistent findings may thus be avoided. [4 C. J. 1194.]'' [Bramblett v. Harlow, 75 S. W. (2d) 626, 633; Hall v. Martindale, 138 S. W. (2d) 657, 660.] In the case at bar the issues on both counts are so interrelated as to necessarily involve another trial of both of them. There could have been no basis for the cancellation of the note and chattel mortgage without the finding by the jury that plaintiff's damages equalled or were in excess of the amount of the note and chattel mortgage. The cancellation of the note and the chattel mortgage was founded upon the verdict of the jury. So a reversal of the judgment on Count I necessarily requires a reversal of the decree on Count II even though no error is assigned as to that count. [See Bramblett v. Harlow, *supra*.] There is no merit in plaintiff's contention. Of course, at another trial, there can be no cancellation of the note and chattel mortgage unless defendants consent to try that issue.

The judgment is reversed and the cause remanded. *Cave, J.*, concurs; *Dew, J.*, not sitting.